UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UTTO INC.,

        Plaintiff,

    v.

METROTECH CORPORATION,

        Defendant.

Case No. 22-cv-01904-WHO

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 9

Before me is a motion for a preliminary injunction filed by plaintiff UTTO Inc. ("UTTO"), seeking to bar defendant Metrotech Corp. ("Metrotech") from marketing, promoting, selling, or distributing firmware in its products that UTTO contends infringes upon one of its patents. The motion is DENIED without prejudice. UTTO has not shown a likelihood of success on the merits, as it has not shown that Metrotech likely infringed on the patent based on the plural construction of "group of buried asset data points." Moreover, Metrotech has raised a substantial question regarding the patent's validity in light of prior art. And UTTO has not shown that it will suffer irreparable harm without preliminary relief, namely because it has not offered sufficient proof that monetary damages would not address the harm.

## BACKGROUND

UTTO develops software in the buried asset locating industry. *See* Mot. for Prelim. Inj. ("Mot.") [Dkt. No. 9] 4:8-10. "Buried assets" include water pipes, cables, phone and other utility lines installed underground. *Id*. at 2:3-5. Whenever an entity takes on a project in a given area, it must determine where these assets are buried, so that any excavation work does not damage or destroy them. *Id*. at 2:5-7. According to UTTO, locating buried assets once largely depended on individual technicians' familiarity with the area and previous work performed there—any maps

were often outdated or inaccurate, and physical identifiers (such as flags or paint) were removed or washed away after projects were completed. *See id*. at 4:14-21.

UTTO asserts that it created a new, more efficient method of locating buried assets with U.S. Patent No. 9,086,441 ("the '441 Patent"), which was issued in 2015. *See id*. at 4:14, 5:11-12. The '441 Patent describes an electromagnetic locating device that receives a selection of data points related to a buried asset over a communications network, which then uses a predefined value to create a buffer zone, and executes a series of steps to guide the operator to the asset. *See id*. at 5:15-22 (citing Ex. 1 ("the '441 Patent") at Claim 1).

The '441 Patent also describes a series of steps that occur in order to narrow the search for the buried asset, including transmitting a unique identifier for the sought-after asset, determining the device's above-surface position related to the asset, and communicating the results to the user. *See id*. at 6:1-10. If the user is not within the buffer zone, the patent calls for a graphic image on the device communicating such, along with a display indicating the proper direction. *See id*. at 6:11-15 (citing '441 Patent at Claims 5-6). Once the user reaches the asset, the device displays another graphic confirming the location. *See id*. at 6:14-15 (citing '441 Patent at Claim 7).

In late 2021, UTTO learned that Metrotech was offering the same type of technology on its RTK-Pro electromagnetic locator devices via firmware that Metrotech called the "RTK-Pro Walk Back Feature" (the "walk back feature"). *See id*. at 1:12-14, 7:23-26. Until then, UTTO "understood Metrotech to be primarily an asset-locating hardware manufacturer," not a software developer or provider. *See id*. at 7:18-21. Upon investigation, UTTO learned that "since possibly March 2021, Metrotech had been offering a walk back feature for its RTK-Pro device that appeared to operate in exactly the same manner as the '441 Patent." *Id*. at 7:26-8:2.

Metrotech describes the RTK-Pro as a utility locator that uses a real-time satellite system to collect location data. Oppo. [Dkt. No. 13] 2:9-11. According to Metrotech, it has used the walk back functionality in other products for more than a decade, and in the vLoc 3 RTK-Pro device at least since December 2020. *Id*. at 2:19-20, 3:1-3. That feature "includes, among other things, the ability to allow a user to walk back to a single previously located point." *Id*. at 2:13-14. Metrotech's "VMMap Cloud" stores online a collection of location points, which are GPS

1  coordinates that specify the latitude and longitude of a landmark previously saved by the RTK-Pro
2  receiver. *Id*. at 2:15-17.
3       UTTO sent Metrotech a cease and desist letter in January 2022, notifying it of apparent
4  infringement of the '441 Patent. Mot. at 8:3-5. After a back-and-forth between the companies,
5  UTTO sued Metrotech on March 25, 2022, alleging infringement of the '441 Patent and unfair
6  competition. *See id*. at 8:3-12; Dkt. No. 1. UTTO filed this motion for a preliminary injunction
7  on April 12, 2022. Dkt. No. 9.

**LEGAL STANDARD**

9       A party seeking a preliminary injunction must establish: (1) that she is likely to succeed on
10  the merits; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3)
11  that the balance of equities tips in her favor; and (4) that an injunction is in the public interest.
12  *Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016) (citing
13  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**DISCUSSION**

15       As a threshold matter, the parties dispute whether UTTO seeks a prohibitory or mandatory
16  injunction. A prohibitory injunction bars a party from taking action and "preserves the status quo
17  pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos
18  Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (citations and quotation marks omitted).
19  A mandatory injunction "goes beyond simply maintaining the status quo and orders the
20  responsible party to take action pending the determination of the case on its merits." *Doe v.
21  Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). The Ninth Circuit describes these types of injunctions
22  as "particularly disfavored." *Marlyn Nutraceuticals*, 571 F.3d at 879. They are generally not
23  granted "unless extreme or very serious damage will result and are not issued in doubtful cases or
24  where the injury complained of is capable of compensation in damages." *Id*. (citations omitted).
25       UTTO seeks an injunction ordering Metrotech to "cease and desist distributing the accused
26  walk back feature in firmware for its product the RTK-Pro, or any similar software, firmware, or
27  other product that embodies the claims of the '441 Patent . . . or using such products . . . to
28  promote them to third parties" until judgement is entered. *See* Proposed Order [Dkt. No. 9-11] 1.

United States District Court
Northern District of California

1      Ordering Metrotech to stop distributing and promoting the walk back feature would require
2   it, at minimum, to remove any promotional materials from its website or YouTube.  *See* Oppo. at
3   6:16-17.  Metrotech's president stated that it also would have to revise "existing advertising,
4   marketing, training materials, and product literature" referencing the walk back feature, as well as
5   modify the VMMap Cloud to remove the feature.  *See id*., Drew Decl. at ¶ 28.[1]  These are all
6   affirmative actions.  The injunction requested is therefore mandatory, meaning UTTO must clear a
7   higher bar for it to be granted.

**I.      LIKELIHOOD OF SUCCESS ON THE MERITS**

   **a.  Infringement**

Literal infringement of a patent occurs when "each and every claim limitation [is] present in the accused product."  *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1378 (Fed. Cir. 2006); *see also Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016).  "To find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial."  *Brilliant Instruments, Inc., v. GuideTech, LLC*, 707 F.3d 1342, 1346 (Fed. Cir. 2013) (citation omitted).  One way to do this is "to show, for each claim limitation, that the accused product performs substantially the same function in substantially the same way with substantially the same result" as the patented product.  *See id*. (citation and quotation marks omitted).

"Claim terms are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."  *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016).  "The appropriate starting point . . . is always with the language of the asserted claim itself."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

---

[1] UTTO objects to several statements in the Drew declaration, along with part of the Lao Declaration.  *See* Reply [Dkt. No. 14] 15.  I did not rely on the contested statements in my analysis of this motion; therefore I decline to rule on any of the objections at this time.

United States District Court
Northern District of California

specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). If the meaning of the term is disputed, "the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). The specification is usually "the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Metrotech argues that UTTO failed to show that the RTK-Pro walk back feature is likely to infringe upon certain limitations of the '441 Patent's claims. It challenges the "generating" and "receiving" limitations of Claim 1 by constructing "group of buried data asset points" to mean "two or more buried data asset points." Oppo. at 10:1-6. It contends that because Metrotech's walk back feature allows a user to walk back to a single point, it does not generate a buffer zone based on two or more buried data asset points, meaning it does not meet the "generating" limitation. *Id*. at 14:12-21.

In support, Metrotech asserts that a person of ordinary skill in the art looking at the claim language, specification, and file history of the '441 Patent would understand a "group of buried data asset points" to mean two or more buried asset data points. *Id*. at 11:1-4. It contends that the plain and ordinary meaning of the word "group," along with the plural use of "buried asset data points," confirms this reading. *Id.* at 11:3-4. It also points to the patent's specification, which it asserts "consistently gives examples that the two-dimensional area comprising the buffer zone is based on two or more buried asset data points." *Id*. at 11:4-12:9 (citing Figures 4A to 4G).

The language of Claim 1 is clear: it claims a method of receiving "a group of buried asset data points" and generating "based on the group of buried asset data points," the two-dimensional buffer zone. *See* '441 Patent at Claim 1. The claim does not mention "one or more" data points, or "a" data point. It describes a "group" of "data points," plural. The ordinary and customary meaning indicates that more than one data point is necessary to create the buffer zone.

The specification also supports this reading. Only twice does it refer to "one or more buried asset data points": describing that a database "may store one or more records for each buried asset, and each record may include one or more buried asset data points," and that the

5

1 device will "calculate[] one or more buried asset data points for the target buried asset." *See* '441
2 Patent at 5:58-66; 9:65-10:4. But neither supports the ordinary reading of the claim language
3 itself, particularly that the buffer zone is generated "based on the group of buried asset data
4 points." *See id*. at Claim 1. Moreover, the figures showing the buffer zone generation (Figures
5 4A to 4G) all depict multiple data points. *See id*. at Figures 4A to 4G.

      UTTO's argument that a person of ordinary skill in the art would understand the phrase to "encompass one data point if that were all that existed" is somewhat contradictory. *See* Mot. at 11:17-19. It contends that because buried assets typically are power lines, water pipes, and telephone cables, and because "it takes at least two points to define a line," that person would "understand that it is highly unlikely that prior technicians would have identified but one data point" and would "understand the claim description to reflect that reality," not that the '441 Patent method did not work if there were only one data point. *Id*. at 11:19-24. But if it takes at least two points to define a line, a person of ordinary skill in the art would likely interpret the claim's language about a group of data points to mean more than one—in other words, "two or more."

      Nor does *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001), support UTTO's construction. There, the Federal Circuit held that a point of sale location need not have at least two material objects, because the claim language recited "*a* material object" and because the specification made clear that only a single material object was required. *See Interactive Gift*, 256 F.3d at 1334. Although the specification included one reference to a "plurality of" material objects, the court held that there was "nothing in the rest of the specification supporting the position that a point of sale location is defined as having at least two blank material objects." *Id*. Although my final interpretation differs from that in *Interactive Gift*—I read "group of buried asset data points" as a plural, while the Federal Circuit constructed the term at issue in the singular—the methodology is the same. The claim language supports my construction, as does the specification.

      "Group of buried asset data points," as stated in the "receiving" and "generating" limitations of Claim 1, means "two or more buried data asset points." Because the generation of the buffer zone relies on multiple points, while the walk back feature requires only a single point,

6

the difference between the '441 Patent and the walk back feature is not insubstantial. Accordingly, UTTO has not shown that it is likely to succeed on the merits of its infringement claim, either through the literal infringement of Claim 1 or under the doctrine of equivalents.

### b. Invalidity

"[I]f the accused infringer presents a substantial question of validity, i.e., asserts an invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022) (citations omitted). If the alleged infringer attacks validity, "the burden is on the challenger to come forward with evidence of invalidity, just as it would at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). The patentee "then has the burden of responding with contrary evidence," which may include analysis and argument. *Id*. The court then considers the evidence presented to determine if the alleged infringer raised a substantial question of validity. *BlephEx*, 24 F.4th at 1399.

Metrotech argues that the '441 Patent is likely invalid in light of prior art. Oppo. at 15:2-6. It points to the prosecution history of the abandoned U.S. Patent Application 14/519,910 ("the '910 Application"), of which the '441 Patent was a continuation-in-part. *See id*. (citing Ex. B); *see also* '441 Patent at 1. The application for the '441 Patent, U.S. Patent Application 14/572,329 ("the '329 Application"), claimed priority to the '910 Application and was pending at the same time. *See* '441 Patent at 1; Ex. B at 3. Metrotech makes two arguments based on this history. First, it contends that the applicant argued that the '910 Application was "almost identical" to and "not patently distinct" from the '441 Patent. *See* Oppo. at 15:15-16. Next, it asserts that because the examiner found the '910 Application to be invalid in light of U.S. Patent No. 2013/0084838 to Smith et al. ("Smith") in view of U.S. Patent Application 2008/0125942 to Tucker et al. ("Tucker"), the '441 Patent is also likely invalid as prior art, given the similarities between the '910 Application and the '441 Patent. *See id*. at 15:13-17:8.

At the least, Metrotech has raised a substantial question of validity. It appears from the prosecution history that there was significant overlap between the claims in the '910 Application and those in Smith, which also appear to overlap those in the '441 Patent. *See, e.g.*, Oppo., Ex. B

7

at 32-49. If the '910 Application was deemed invalid because of prior art, the '441 Patent may be invalid on similar grounds. UTTO has not proffered competing evidence—only a brief and outdated analysis—foreclosing a substantial question of validity. *See* Reply at 11:6-16. This tips in Metrotech's favor, at least when considering UTTO's likelihood of success on the merits.[2]

UTTO has not shown a likelihood of success on the merits in terms of infringement. Metrotech has also raised a substantial question of validity. This weighs against granting UTTO's motion for a preliminary injunction.

## II.     IRREPARABLE HARM

A party seeking a preliminary injunction must show that it is likely to suffer irreparable harm without the injunction, as well as a causal nexus between the alleged infringement and the alleged harm. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017). Lost sales alone does not suffice; rather, the party must show that "no amount of monetary damages, however great, could address the harm." *See id*.

UTTO contends that it will suffer irreparable harm without this injunction because Metrotech has offered its software to some of UTTO's biggest clients, causing purchases of UTTO products to stall or fall apart. Mot. at 18:21-26 (citing Haddy Decl. at ¶ 31). As a result, UTTO has had to "offer more price flexibility." *Id*. at 18:14-17 (citing Haddy Decl. at ¶ 30). UTTO asserts that this has had a "devastating" impact on UTTO's market share—harm that it argues "is not something that can be compensated with dollars but, absent injunctive relief, will require UTTO to completely overhaul its business model." *Id*. at 18:26-19:1 (citing Haddy Decl. at ¶ 31).

Courts have recognized that a loss of market share constitutes irreparable injury. *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010); *Trebro Mfg., Inc., v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014). I am sympathetic to UTTO's position as a "small pioneering company," its allegation that the '441 Patent and walk back feature are the

---

[2] Metrotech also argues that the '441 Patent is invalid because two prior art systems anticipate or render the patent obvious. *See* Oppo. at 17:9-22:27. This line of argument depends on UTTO's singular construction of "group of buried asset data points." Because I construct "group of buried asset data points" to mean two or more points, I need not address the arguments related to anticipation and obviousness.

8

only industry offerings of this type of technology, and the challenges of competing with Metrotech. *See* Mot. at 2:18-24, 18:21-19:3. I also take seriously UTTO's contention that the alleged infringement threatens its business. But the evidence proffered (in the form of the Haddy declaration) does not offer enough detail about the purported loss in market share or why UTTO will be forced to "completely overhaul" its business model in order to compete with Metrotech. *See* Mot., Haddy Decl. at ¶¶ 30-31. In other words, it does not adequately explain why monetary damages could not address the harm. Accordingly, UTTO has not shown it will suffer irreparable harm without injunctive relief.[3]

### III. BALANCE OF EQUITIES AND PUBLIC INTEREST

Given my conclusions at this stage on the merits and irreparable harm, I cannot conclude that the balance of equities and the public interest tip the scales in favor of UTTO. I recognize that UTTO's business relies on the patented software. And it is also true that "the public generally does not benefit when . . . competition comes at the expense of a patentee's investment-backed property right." Mot. at 21:10-16 (citing *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 647 (Fed. Cir. 2015). But when a claim does not appear to have merit and the harm does not appear to be dire, it would be inequitable and against the public interest to impose the extraordinary remedy of an injunction.

---

[3] Metrotech argues that UTTO's "delay" in seeking this injunction undermines any claim of irreparable harm. *See* Oppo. at 4:15-22. It contends that UTTO should have known about the RTK-Pro's walk back feature much earlier, via online searches and UTTO's awareness that Metrotech manufactured and sold products in a competing space. *Id*. at 5:6-24. First, I accept as true UTTO's allegation that it did not discover the alleged infringement until late December 2021 and sought injunctive relief after its cease and desist letter went unheeded. *See* Mot. at 2:25-3:13. Next, Metrotech offers no authority applying constructive knowledge in this particular context (i.e., determining irreparable harm to a patentee for the purposes of a preliminary injunction). *See* Oppo. at 4:23-6:7. *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998), considered constructive knowledge in the context of laches on a motion for summary judgment. The in-circuit cases cited do not address constructive knowledge, only the plaintiff's delay in seeking an injunction. *See Clean Air Eng'g Maritime, Inc., v. Advanced Cleanup Techs. Inc.*, No. CV-12-08669, 2014 WL 12588680, at *5 (C.D. Cal. Feb. 28, 2014); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999).

9

**CONCLUSION**

UTTO has not shown that it is likely to succeed on the merits or that it will suffer irreparable harm without preliminary relief. These are early days in this litigation, and it may be that the claim construction briefing will cause me to change the construction discussed above or that discovery will clarify the merits of this litigation. For now, the motion for a preliminary injunction is DENIED without prejudice.

**IT IS SO ORDERED.**

Dated: June 2, 2022



William H. Orrick
United States District Judge