1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

UTTO INC.,

8

Plaintiff,

9

v.

10

METROTECH CORPORATION,

11

Defendant.

Case No. 22-cv-01904-WHO

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 42

12

United States District Court
Northern District of California

13

For the fourth time, defendant Metrotech Corp. ("Metrotech") moves to dismiss the

14

operative complaint filed by plaintiff UTTO Inc. ("UTTO"), which alleges that Metrotech

15

infringed upon one of UTTO's patents and interfered with its prospective economic advantage.

16

The motion to dismiss the Third Amended Complaint ("TAC") is GRANTED and UTTO's claims

17

DISMISSED with prejudice.  UTTO has not shown that the "buffer zone" recited in Claim 1's

18

"generating limitation" can be generated using only one buried asset data point.  Nor has UTTO

19

adequately alleged that the walk back feature's use of one data point is functionally equivalent to

20

the group of buried asset data points needed to generate that buffer zone.  As a result, UTTO has

21

not sufficiently pleaded an infringement claim.

22

UTTO's interference claim fails as well, primarily because it relies on unreasonable

23

inferences and conclusory statements in alleging an independently wrongful act by Metrotech, and

24

has not adequately pleaded such an act.  As this was UTTO's fourth attempt to state a plausible

25

claim, and it failed to do so, these claims are DISMISSED with prejudice.

26

**BACKGROUND**

27

UTTO is the assignee of U.S. Patent No. 9,086,441 ("the '441 Patent"), which claims a

28

method for locating "buried assets"—industry terminology for underground utility lines, pipes,

United States District Court
Northern District of California

1    and cables.  TAC [Dkt. No. 41] ¶¶ 8, 12, 17.  According to UTTO, the '441 Patent provides a

2    "more efficient, safe, and precise way of locating a particular buried asset," particularly when

3    there are multiple assets buried in close proximity.  *See id*. ¶ 12.

4          The '441 Patent has seven claims, only the first of which is independent.  *See* TAC, Ex. 1

5    ("'441 Patent").  Claim 1 recites the following:

6              A method on a mobile computing device for locating electromagnetic signals
               radiating from a buried asset, the method comprising:
7

8              receiving, via a communications network communicatively coupled with the
               mobile computing device, a group of buried asset data points corresponding to a
9              particular buried asset sought by an operator of the mobile computing device;

10             reading a predefined value pertaining to a width of a buffer zone;

11
               generating, based on the group of buried asset data points, a two-dimensional area
12             comprising the buffer zone at an above-surface location, wherein a width of the
               buffer zone corresponds to the predefined value, and wherein the buffer zone
13             corresponds to the particular buried asset;

14             iteratively executing the following four steps:

15             a)  calculating an above-surface location of the mobile computing device using
16                 spatial processes;

17             b)  determining whether the above-surface location of the mobile computing device
                   is located within the two-dimensional area;
18

19             c)  if the above-surface location is not located within the two-dimensional area,
                   displaying a first graphic in a display of the mobile computing device; and
20

21             d)  if the above-surface location is located within the two-dimensional area,
                   displaying a second graphic in the display.

22   *Id*. at 17:48-18:16.

23         In late December 2021, UTTO learned that Metrotech had been advertising online

24   firmware for its product, "RTK-Pro Utility Locator with Survey-Grade GNSS" ("RTK-Pro"),

25   which UTTO contends "describes a method involving an electromagnetic locator that appears to

26   infringe the '441 Patent."  TAC ¶¶ 16, 28.  The parties refer to that method as the "walk back

27   feature."  *See id*. ¶¶ 16, 17.

28         On December 21, 2021, UTTO was scheduled to meet with a third party, Honeywell, as

United States District Court
Northern District of California

1    part of "continued negotiations with Honeywell regarding the sale of UTTO products which would

2    include licensing of the '441 Patent." *Id*. ¶ 46. Those negotiations began in early October 2021,

3    and involved "several follow-up telephone calls" between Honeywell and UTTO through

4    December of that year. *Id*. According to UTTO, "Honeywell said that it wanted to include locator

5    services in its offerings and that it was impressed" with UTTO's "Locate Assurance" platform. *Id*.

6    For hardware, Honeywell "planned to use Metrotech's locator devices." *Id*. ¶ 47. Honeywell

7    requested the December 21 meeting "to see if Metrotech and UTTO could collaborate and whether

8    data retrieved by Metrotech's physical devices could be UTTO compliant." *See id*.

9         At that meeting, a Honeywell representative "asked if the Honeywell data Metrotech was

10   storing could be delivered in a format that would work with the UTTO software." *Id*. ¶ 51.

11   According to UTTO, a Metrotech representative "said that it was not a question of whether

12   Metrotech could provide UTTO compliant data and that of course it could" but "whether

13   Metrotech was willing to provide the data to UTTO and that, if it did, he would expect Metrotech

14   would charge Honeywell extra." *Id*. UTTO alleges that the Metrotech representative "also

15   promoted the walk back feature during the course of the meeting." *Id*.

16        Honeywell and UTTO's parent company discussed the terms of a "possible software as a

17   service agreement" through early January 2022. *Id*. ¶ 46. According to UTTO, "[t]he negotiations

18   even reached the point where Honeywell forwarded a final draft agreement to UTTO with specific

19   terms that were expected to govern the parties' contractual relationship," including the term of the

20   agreement, the means for providing deliverables, and provisions that any mapping data created in

21   the course of performance belonged to Honeywell. *Id*. The deal was "nearly finalized." *Id*.

22        However, on July 7, 2022, Honeywell announced in a press release that it was "expanding

23   its smart energy offering with underground utility locating and data capturing services" and

24   featured a picture of Metrotech's RTK-Pro. *Id*. ¶ 56.

25        On January 31, 2022, UTTO wrote Metrotech about the purported infringement of the '441

26   Patent. *Id*. ¶ 29. In mid-March, Metrotech denied that the walk back feature infringed. *Id*. ¶ 32.

27   A brief back-and-forth between the parties followed, culminating in the filing of this lawsuit on

28   March 25, 2022. *See id*. ¶¶ 32-34, Dkt. No. 1.

1      I have since denied a motion for preliminary injunction from UTTO and granted two

2   motions to dismiss filed by Metrotech.  Dkt. Nos. 21, 30, 39.  After UTTO filed its TAC,

3   Metrotech again moved to dismiss.  Dkt. Nos. 41, 42.

**LEGAL STANDARD**

5      Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

6   if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion, the

7   plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*

8   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff

9   pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for

10  the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There

11  must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts

12  do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to

13  "raise a right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555, 570.

14     In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

15  court accepts her allegations as true and draws all reasonable inferences in her favor.  *See Usher v.*

16  *City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to

17  accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or

18  unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

19     If the court dismisses the complaint, it "should grant leave to amend even if no request to

20  amend the pleading was made, unless it determines that the pleading could not possibly be cured

21  by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

22  this determination, the court should consider factors such as "the presence or absence of undue

23  delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

24  undue prejudice to the opposing party and futility of the proposed amendment."  *See Moore v.*

25  *Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

27  **I.     INFRINGEMENT**

28     "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention,

4

United States District Court
Northern District of California

1    within the United States or imports into the United States any patented invention during the term

2    of the patent therefor, infringes the patent."  35 U.S.C. § 271(a).

3            A device must practice all elements of a claim to be liable for direct infringement.

4    *Fortinet, Inc. v. Forescout Techs., Inc.*, No. 20-CV-03343-EMC, 2020 WL 6415321, at *11 (N.D.

5    Cal. Nov. 2, 2020).  A "direct infringement claim does not satisfy the standards of *Twombly* and

6    *Iqbal* where it does not at least contain factual allegations that the accused product practices every

7    element of at least one exemplary claim."  *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d

8    1133, 1142-43 (N.D. Cal. 2019) (citation and quotation marks omitted).

9            "To find infringement under the doctrine of equivalents, any differences between the

10   claimed invention and the accused product must be insubstantial."  *Brilliant Instruments, Inc. v.*

11   *GuideTech, LLC*, 707 F.3d 1342, 1346 (Fed. Cir. 2013) (citation omitted).  A plaintiff can do this

12   by showing "for each claim limitation, that the accused product performs substantially the same

13   function in substantially the same way with substantially the same result as each claim limitation

14   of the patented product."  *Id*. at 1347 (citation and quotation marks omitted).

15           The previous motion work has whittled down the number of issues with UTTO's

16   infringement claim.  *See, e.g.,* Order Granting Mot. to Dismiss ("Second MTD Order") [Dkt. No.

17   39] 4:20-8:18.  What remains relates to the "generating" limitation in Claim 1, which recites a

18   method

19           generating, based on the group of buried asset data points, a two-dimensional area
20           comprising the buffer zone at an above-surface location, wherein a width of the
             buffer zone corresponds to the predefined value, and wherein the buffer zone
21           corresponds to the particular buried asset.

22   '441 Patent at 17:58-18:3.  I most recently dismissed UTTO's infringement claim because

23   although it "sufficiently alleged that the walk back feature creates a two-dimensional graphic

24   corresponding to a particular buried assert," it did not allege "how the walk back feature's two-

25   dimensional zone is created, whether by using multiple data points or just one."  Second MTD

26   Order at 7:26-8:12.  As I wrote: "This is an element of the limitation at issue; it must be addressed

27   for the infringement claim to proceed."  *Id*. at 8:11-12.

28           Metrotech argues that these allegations are still missing from the TAC, though it slightly

United States District Court
Northern District of California

United States District Court
Northern District of California

1    misstates the issue.  *See* Mot. to Dismiss ("MTD") [Dkt. No. 42] 4:18-25.  It contends that

2    "UTTO's pleading is still opaque as to *how* it believes Metrotech's device purportedly generates a

3    two-dimensional zone using a walk back point" and that "allegations as to how exactly the walk

4    back feature operates do matter."  *See id*. at 5:16-6:2 (emphasis in original).  To be clear: I did not

5    ask UTTO to allege "how *exactly* the walk back feature operates."  Doing so could require

6    evidence of how Metrotech's firmware functions, which veers into summary judgment territory

7    rather than that of a motion to dismiss, where a plaintiff must only allege "enough facts to state a

8    claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Doing so "simply calls for

9    enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing.

10   *See id*. at 556.

11          What was missing from the Second Amended Complaint ("SAC") was any allegation that

12   the walk back feature's two-dimensional zone was generated "based on the group of buried asset

13   data points," as required to plead infringement on the '441 Patent.  *See* Second MTD Order at

14   7:26-8:12.

15          According to Metrotech, the same issue again sinks UTTO's infringement claim.

16   Metrotech's strongest argument is that the buffer zone described in the generating limitation is

17   only generated using multiple buried asset data points, and that UTTO has not plausibly alleged

18   that the walk back feature uses more than one data point to generate an equivalent.  *See* MTD at

19   6:9-8:16.  In support, it points to the '441 Patent's embodiments (specifically, Figures 4A through

20   4G) and specification, which, in relevant part, speak to the "union" of circular two-dimensional

21   areas surrounding buried asset data points.  *See id*. at 7:22-8:7.

22          UTTO's response focuses on infringement under the doctrine of equivalents, arguing that

23   the "crux" of its allegations "is that, even if the RTK-Pro were using 'just one' walk back point at

24   a time to generate buffer zones, over and over, that is the functional equivalent of using multiple

25   data points to generate buffer zones in the manner described in the '441 Patent—that is, 'creating a

26   circle around each buried asset data point.'"  *See* Oppo. [Dkt. No. 51] 5:25-6:3 (citing TAC ¶ 19).

27   It then points to Paragraphs 19 and 20 of the TAC, specifically the allegations that:

28

Although the promotional video [on YouTube][1] demonstrates only how the first in a sublist of three "walk back points" is retrieved and verified, a person of ordinary skill in the art would understand that the same procedure could be performed on the other two "walk back points" that were selected. . . . It does not matter whether the RTK-Pro generates circles around the multiple walk back points retrieved one at a time or whether it does so all at once.  The use of the RTK-Pro is functionally equivalent to the '441 Patent in either event.

. . .

[A]fter the starting point involving receiving data points from a previous survey, the '441 Patent can operate on each data point retrieved individually.  If the locating functions are turned off for some or all but one of the data points, the process is the functional equivalent of generating a buffer zone around only those data points selected, which could be a single data point if the operator so chooses.

*Id*. at 6:6-15 (citing TAC ¶¶ 19-20).  In other words, UTTO argues that even if the walk back feature generates a circle around one data point at a time, it is (1) functionally equivalent to the '441 Patent's generation of a buffer zone based on multiple data points; or (2) functionally equivalent to the '441 Patent's ability to generate a buffer zone based on one data point.  *See id*.

UTTO's argument is thin at best.  First, it has not adequately alleged that the '441 Patent can generate a buffer zone based on one data point.  The TAC alleges that "the buffer zone can be drawn around all the data points collectively or each one individually" and that the patent "explains, in one embodiment, a circular buffer zone can be generated around each separate data point." *Id*. ¶ 19.  UTTO points to language in the patent that an unidentified embodiment will "create a circle around each buried asset data point using the radius value as the radius measurement of each circle." *Id*.

But the TAC omits critical language from the patent specification, which describes each of the relevant embodiments depicted in Figures 4A through 4G.  *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) (describing the "sources properly considered on a motion to dismiss" as including "the complaint, the patent, and materials subject to judicial notice").  As stated in the description, each of these figures "show how buffer zones are created based on buried asset data points," plural.  *See* '441 Patent at 3:28-31.  The detailed

[1] UTTO's TAC again references and relies upon a YouTube video published by Metrotech that describes the walk back feature, which was filed manually as Exhibit 2 to the SAC and can be found at https://www.youtube.com/watch?v=NkfVDwFm9Ls.  *See* TAC ¶ 17.

United States District Court
Northern District of California

1    description goes on to explain that in some of these embodiments, a two-dimensional circle is

2    created around each buried asset data point, "wherein the union of all of the circular two-

3    dimensional areas comprises the buffer zone around the buried asset data points. *See id*. at 12:16-

4    20 (Figure 4C); 12:47-51 (Figure 4D). In others, "buffer points" are defined on either side of

5    "each buried asset data point," and those buffer points then connected via line segments "so as to

6    generally define a two-dimensional area comprising the buffer zone." *Id*. at 13:1-22 (Figure 4E);

7    13:59-14:10 (Figure 4F); 14:51-63 (Figure FG).[2] No matter how the embodiments are described,

8    they distinguish between circles or buffer points that relate to each buried asset data point, and the

9    union or connection of those circles or buffer points that create the actual buffer zone.

10          In the TAC, UTTO appears to conflate the circles drawn around buried asset data points

11   and the buffer zone itself. It again relies on the Metrotech YouTube video, which does show that

12   the walk back feature generates a circle around a data point. *See* TAC ¶ 20 ("The March 2022

13   YouTube video also shows how the walk back feature works by creating a two-dimensional

14   graphic that pops up on the RTK-Pro screen. . . . The two-dimensional graphic consists of a circle

15   around the walk back point and the user's location in relation to the circle."). But the video does

16   not show any union of that circle with others to create the buffer zone that is disclosed in Claim 1.

17   *See id*. The TAC alleges that the circle is "essentially the same as the '441 Patent's buffer zone."

18   *See id*. But the patent description belies this point, as it is the "union of all of the circular two-

19   dimensional areas" that "comprises the buffer zone." *See* '441 Patent at 12:16-20, 12:47-51; *see*

20   *also Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) ("In

21   ruling on a 12(b)(6) motion, a court need not accept as true allegations that contradict matters

22   properly subject to judicial notice or by exhibit, such as the claims and patent specification.")

23   (citations and quotation marks omitted).

24          This difference is substantial. As alleged, the walk back feature misses a step critical to the

25

26   [2] Although the detailed description uses different language for Figures 4A and 4B, in both the
     buffer zone is "generated by device using buried asset data points"—again, plural. *See* '441
27   Patent at 11:29-41. The description then states that Figure 4B "shows that a two-dimensional area
     comprising a buffer zone has been created around the buried asset data points" and the "two-
28   dimensional area was generated by defining a two-dimensional circle around each buried asset
     data point" wherein each circle was connected. *Id*. at 11:42-49.

United States District Court
Northern District of California

1   generation of the buffer zone claimed in the '441 Patent, as it only generates a two-dimensional

2   area around a buried data point and does not join together areas around multiple data points to

3   create the buffer zone.  The accused product, therefore, does not perform "substantially the same

4   function *in substantially the same way* with substantially the same result" as the generating

5   limitation in Claim 1, as needed to allege infringement under the doctrine of equivalents.  *See*

6   *Brilliant Instruments*, 707 F.3d at 1347 (emphasis added).

7           UTTO's allegations that the '441 Patent "may be used to work with fewer than all of the

8   data points available" are also belied by the patent itself.  *See* TAC ¶ 19.  UTTO points to the

9   patent description and alleges that "functions performed on data points can be turned off" and the

10  operator can then work with a "'portion' of the data points retrieved, as opposed to all of them."

11  *See id*.  It further alleges that "[i]f the locating functions are turned off for some or all but one of

12  the data points, the process is the functional equivalent of generating a buffer zone around only

13  those data points selected, which could be a single data point if the operator so chooses."  *See id*.

14          But this reads out the above-cited language of the specification.  The references to reading

15  "the precision data values of all or a portion of the geographical coordinates of the buried asset

16  data points" are accompanied by a description of: (1) generating either a two-dimensional circle

17  around or buffer points related to "each buried asset data point," and (2) joining those circles or

18  points so as to define the buffer zone.  *See* '441 Patent at 12:1-15; 12:47-66; 13:59-14:10; 14:16-

19  43.  It is not reasonable to infer, then, as UTTO alleges, that locating functions of all but one data

20  point can be turned off, so that the buffer zone is generated solely based on that one point.  The

21  language of the specification makes clear that buffer zones are generated using more than one data

22  point, as they require the union or joinder of more than one circle or buffer point.

23          The remaining question is whether the walk back feature is functionally equivalent to the

24  '441 Patent if it generates one circle around one walk back point, then another circle around

25  another walk back point, and so on.

26          According to UTTO, the answer is yes.  The opposition first points to allegations within

27  the TAC that "generating one circle and then another based on multiple walk back points is

28  functionally indistinguishable from generating multiple buffer zones all at the same time."  *See*

United States District Court
Northern District of California

1    Oppo. at 8:13-15 (citing TAC ¶ 20).  In support, it cites cases where courts "have held that the

2    order in which steps are performed may show lack of literal infringement, yet infringement may be

3    established under the doctrine of equivalents.  *Id*. at 7:9-17.

4         But, as Metrotech notes, those cases are distinguishable because they expressly considered

5    the order of steps set forth limitation-by-limitation.  *See* Reply [Dkt. No. 55] 6:6-18; *see also*

6    *Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 958-60 (N.D. Cal.

7    2018) (finding that the "plain language of the claim terms requires an 'ordering of steps'"); *Cave*

8    *Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, No. 15-CV-02177-SI, 2016 WL 2902234,

9    at *11 (N.D. Cal. May 13, 2016) (finding that "the claims do not require the steps to be performed

10   in the exact order listed").  UTTO does not allege, for instance, that the "receiving" limitation may

11   occur after the "generating" limitation, which would be akin to the order of steps considered in

12   *Huawei Technologies* and *Cave Consulting*.  Instead, the issue is language within one limitation.

13        The inherent problem with UTTO's argument is that, as alleged, the walk back feature uses

14   only one data point at a time and, as explained, the '441 Patent requires the use of multiple data

15   points to generate the buffer zone.  Using one data point at a time to generate a two-dimensional

16   area is not sufficiently akin to "generating, based on the group of buried asset data points, a two-

17   dimensional area comprising the buffer zone . . . wherein the buffer zone corresponds to the

18   particular buried asset," as recited in Claim 1.  *See* '441 Patent at 17:58-18:3.  As a result, UTTO

19   has not pleaded infringement, either directly or under the doctrine of equivalents.

20        This was UTTO's fourth attempt to plead a plausible infringement claim.  In my prior

21   Order, I gave UTTO "one final opportunity to amend its complaint and state a plausible claim."

22   Second MTD Order at 12:19-20.  It failed to do so.  This claim is DISMISSED with prejudice.

23   **II.      INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

24        A plaintiff alleging tortious interference with prospective economic relations must show:

25   (1) an economic relationship between the plaintiff and a third party, with the probability of future

26   economic benefit to the plaintiff; (2) the defendant's knowledge of that relationship; (3)

27   intentional acts by the defendant designed to disrupt the relationship; (4) actual disruption of the

28   relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts.

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1    *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (citations omitted).

2    The plaintiff must also plead that the defendant "engaged in an independently wrongful act." *Id*.

3    at 1158.  Improper motive does not suffice; the act must be "proscribed by some constitutional,

4    statutory, regulatory, common law, or other determinable legal standard." *Id*. at 1158-59.

5    UTTO's interference allegations stem from the December 21, 2021, meeting between

6    UTTO, Metrotech, and Honeywell.  TAC ¶¶ 44-58.  In dismissing the interference claim as

7    alleged in the SAC, I identified two primary flaws: UTTO had not plausibly alleged an existing

8    economic relationship between it and Honeywell or an independently wrongful act by Metrotech.

9    Second MTD Order at 9:17-18, 10:20-22.  According to Metrotech, those problems persist in the

10   TAC.  MTD at 9:3-10, 10:23-24.

11   To UTTO's credit, it added allegations to the TAC that further support the existence of an

12   economic relationship between UTTO and Honeywell with the probability of future economic

13   benefit to UTTO.  Namely, the complaint now alleges that the negotiations between the two

14   entities "reached the point where Honeywell forwarded a final draft agreement to UTTO with

15   specific terms that were expected to govern the parties' contractual relationship," and included

16   examples of those terms.  *See* TAC ¶ 46.  It also alleges that "[t]he deal was nearly finalized." *Id*.

17   However, even if this were enough to transform UTTO's relationship with Honeywell

18   from a potential economic relationship to an existing one, UTTO's interference claim still falls

19   short. *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, No. 16-CV-05399-WHO, 2017

20   WL 67075, at *6 (N.D. Cal. Jan. 6, 2017) (dismissing interference claims because the plaintiff did

21   not establish an existing relationship and "[a]n allegation of interference with a potential customer

22   is too speculative to state a claim").  That is because the TAC does not plausibly allege that

23   Metrotech committed any "independently wrongful act" that is "proscribed by some

24   constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea

25   Supply*, 29 Cal. 4th at 1159.  As with the SAC, UTTO's allegations depend on conclusory

26   allegations and unreasonable inferences, neither of which are sufficient to support a claim so that it

27   survives a motion to dismiss. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055.

28   The heart of UTTO's argument is what it contends is Metrotech's "insistence" that

11

1

2

> if Honeywell sought to license UTTO's software services, Metrotech could withhold Honeywell's own data from UTTO or Honeywell, either entirely or, if it allowed it, Honeywell could be required to pay a penalty for working with UTTO in the form of extra charges to be paid to Metrotech, to be determined entirely by Metrotech in exchange for Honeywell's access to its own data.

3

4

TAC ¶¶ 54-55.  UTTO bases this line of argument on two comments from the December 21

5

meeting: the Metrotech representative's comment that "it was not a question of whether Metrotech

6

could provide UTTO compliant data and that of course it could, that Metrotech had that covered"

7

but "whether Metrotech was willing to provide the data to UTTO and that, if it did, he would

8

expect Metrotech would charge Honeywell extra."  *Id*. ¶ 51.

9

According to UTTO, the representative "was suggesting that Metrotech would either not

10

allow the data to be used by UTTO at all or, if it did grant access, it would charge a fee that would

11

make it not worth the while to involve UTTO."  *Id*.  It further contends that

12

13

> Metrotech's position was clear: Either Honeywell would have to abandon plans to contract with UTTO, or Honeywell would have to pay Metrotech an increased price if it wanted to work with UTTO, which Metrotech could determine as it saw fit since it had possession of the data, and so could it price UTTO out of the competition if it wanted to.

14

15

16

*Id*.

17

As alleged, the statements of Metrotech's representative fall within acceptable commercial

18

practice, and the inference UTTO seeks to draw is not reasonable.  As I stated in my prior Order,

19

"the reasonable inference is that Metrotech told a potential customer that it would cost more to use

20

Metrotech's data with another company's software"—a statement that makes sense, as "[i]t is both

21

common and reasonable for companies to charge extra costs for extra services."  *See* Second MTD

22

Order at 11:19-22.  The purported comments by the Metrotech representative do not, as UTTO

23

suggests, indicate that Metrotech planned to hold Honeywell's data "hostage" or charge a fee so

24

costly that Honeywell would be dissuaded from working with UTTO.  Nothing in the TAC

25

indicates that any fee Metrotech *might* have charged would be so high that it would effectively

26

"price UTTO out of the competition."  *See* TAC ¶ 51.  Rather, it is reasonable to infer that

27

Honeywell expected certain costs out of an agreement with both UTTO and Metrotech—as

28

alleged, the very purpose of the meeting was to "see if Metrotech and UTTO could collaborate and

United States District Court
Northern District of California

1    whether data retrieved by Metrotech's physical devices could be UTTO compliant." *See id.* ¶ 47.

2    And if Metrotech indeed suggested that it would not allow Honeywell's data to be used by UTTO

3    at all, based on the allegations in the TAC, it is unreasonable to infer that Honeywell would simply

4    refuse to work with UTTO as a result, rather than attempt to challenge Metrotech's actions. *See*

5    *id.* ¶ 51 ("the idea that a party that stores electronic communications of another . . . could

6    determine who should have access to the communication flies in the face of the laws governing

7    electronic storage service providers").

8         The TAC also alleges that Metrotech overstated its own software expertise to Honeywell

9    and could not provide UTTO-compliant data. *See id.* ¶¶ 51-52.  UTTO contends that, soon after

10   the December 21 meeting, the Metrotech representative contacted UTTO "seeking to obtain

11   various details about UTTO's technical specifications and features," and that this conversation

12   "indicated that Metrotech did not in fact have the level of software expertise Metrotech wanted to

13   lead Honeywell to believe it had with regard to converting the data." *Id.* ¶ 52.  I also addressed

14   this point on the prior motion to dismiss.  It too relies on an unreasonable inference: that when

15   Honeywell asked Metrotech whether it could provide data to UTTO, Metrotech's comment that it

16   "had that covered" was somehow a representation of its software capabilities. *See* Second MTD

17   Order at 12:7-14.  What was true in the SAC remains so: Metrotech's follow-up questions to

18   UTTO were reasonable given the alleged purpose of the meeting, which was to explore pairing

19   UTTO's software with Metrotech's hardware. *See id.*  In general, the allegations supporting

20   UTTO's interference claims are based on a series of inferences that are unreasonable, given the

21   purpose of the meeting, the comments themselves, and the context in which they were made.

22        Compounding the issue are the TAC's conclusory statements about the laws that were

23   allegedly violated.  UTTO alleges that "Metrotech's insistence on holding Honeywell's own data

24   hostage to get Honeywell to abandon its plans with UTTO was independently wrongful" because

25   it was "unlawful under the Sherman Act or the Cartwright Act" as well as "unfair and fraudulent

26   within the meaning of California's Unfair Competition Law."  TAC ¶ 55.  It also alleges that "the

27   idea that a party that stores electronic communications of another . . . could determine who should

28   have access to the communication flies in the face of the laws governing electronic storage service

United States District Court
Northern District of California

1   providers such as the Stored Communications Act." *Id.* ¶ 51.  But the TAC does not elaborate any

2   further.  It does not explain what is prescribed by any of these statutes or how Metrotech's

3   comments purportedly violated their provisions.  *See id.*  And the opposition does not mention

4   these laws, let alone provide any specificity.  *See* Oppo. at 15:8-27.

5          UTTO's interference claim relies on conclusory statements and unreasonable inferences,

6   which I am not required to accept in deciding a motion to dismiss.  It has failed to plausibly state

7   an interference claim, primarily because it has not sufficiently alleged an independently wrongful

8   act by Metrotech.  UTTO has had ample opportunity to state this claim and has failed to do so.  It

9   is DISMISSED with prejudice.

**CONCLUSION**

10          Metrotech's motion to dismiss is GRANTED.  UTTO's claims are DISMISSED with

12   prejudice.

13          **IT IS SO ORDERED.**

14   Dated: December 19, 2022



William H. Orrick
United States District Judge

United States District Court
Northern District of California